**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| STANLEY BLACK & DECKER, INC., | ) | Civil No. 3:23-cv-1050 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PARK OHIO FORGED AND MACHINED | ) | |
| PRODUCTS LLC, d/b/a AJAX-CECO | ) | |
| Defendant. | ) | August 7, 2023 |

## COMPLAINT

Plaintiff Stanley Black & Decker, Inc. files this Complaint against defendant Park Ohio Forged and Machined Products LLC, d/b/a Ajax-CECO. In support of its claims, plaintiff alleges as follows.

## FACTS

**I.   The parties.**

1. Plaintiff Stanley Black & Decker, Inc. (SBD or plaintiff) is a Connecticut corporation with its principal place of business at 1000 Stanley Drive, New Britain, Connecticut 06053. SBD is the world's largest tool company and operates manufacturing facilities in the United States and around the world.

2. Defendant Park Ohio Forged and Machined Products LLC, d/b/a Ajax-CECO (Ajax or defendant), is an Ohio limited liability company with its principal place of business at 29100 Lakeland Boulevard, Wickliffe, Ohio 44092. Ajax is in the business of manufacturing highly automated and fully integrated forged and machined products for industrial uses.

3. Ajax is a wholly owned subsidiary of Park-Ohio Holdings Corp., an Ohio corporation with its principal place of business at 6065 Parkland Boulevard, Cleveland, Ohio 44124. On information and belief, the defendant's sole member and sole owner is Park-Ohio

1

Holdings Corp.

**II.     Jurisdiction and venue.**

4.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      The events giving rise to this action occurred as a result of and are related to the performance of an Equipment Purchase Agreement between SBD and Ajax, dated February 9, 2019, and executed on May 28, 2019. *See* Exhibit A (the "Agreement").  Through the Agreement, the parties acknowledged that their contractual relationship was "made and entered into in the State of Connecticut," and "governed by and construed in accordance with the laws of the State of Connecticut." Agreement, Art. 12. The parties further agreed to the exclusive jurisdiction of the state and federal courts of Connecticut in connection with all matters involving the Agreement. *Id.*

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**III.    The Agreement.**

7.      This case arises from SBD's agreement to purchase industrial equipment from Ajax for use at SBD's manufacturing facility in Fort Worth, Texas.

8.      In early 2019, SBD was preparing to break ground on its new Fort Worth manufacturing facility.  The facility was slated to produce Craftsman brand hand-tools, including sockets, ratchets, and wrenches, among other tools.

9.      Before it could produce these tools, SBD needed to procure reliable, efficient mechanical presses and related accessories.  This equipment was essential to shape, straighten, cut, and forge SBD's hand-tools in accordance with its exacting specifications. In order to ramp up to full production at the Fort Worth facility, it was necessary for SBD to procure and complete

installation and testing of this critical equipment.

10. In May of 2019, SBD and Ajax entered into the Equipment Purchase Agreement. *See* Exhibit A. Under the Agreement and the quotation from Ajax attached to it as an appendix, Ajax agreed to deliver certain Tooling, which consisted of a total of four mechanical press machines and related accessories for use in the Fort Worth facility. Exhibit A (Quotation #21812-Rev. 12). These accessories included three straighten and cut machines used to pull, straighten, and cut steel wire before continuing the forging process in the mechanical press machines.

11. The Agreement and accompanying quotation required Ajax to deliver the first mechanical press machine within 42 weeks after acceptance of the purchase order. Additional mechanical press machines and related accessories were to be delivered over the course of 12 weeks after the delivery of the first machine.

12. The total purchase for price for this equipment was $4,803,322.40. Under the terms of the Agreement, SBD's payment obligations were governed by, and subject to, completion of specific Milestones:

   a. Thirty percent of the purchase price was payable upon acceptance of the quotation and Ajax's receipt of the purchase order (Milestone 1);

   b. Fifty percent was payable upon acceptance of certain interim milestones (Milestone 2);

   c. Twenty percent was payable upon SBD's acceptance of the equipment at its facility (Milestone 3).

13. In the event of a failure to meet these Milestones, SBD had the right under the Agreement to withhold payment until Ajax cured its failures. Pursuant to the Agreement, this right to withhold payment applied "in addition to any other rights or remedies described in th[e]

Agreement or available to [SBD] at law, in equity or otherwise." Agreement, Art. 3.2.

14. Under the Agreement, Ajax warranted that all Tooling would "conform with the Specifications (including features and descriptions) applicable thereto." Agreement, Art. 8. The Agreement also provided additional warranties, including, but not limited to, an express promise that the Tooling would be free from defects in material or workmanship.

15. The Agreement separately provided requirements governing the testing and acceptance of all Tooling delivered by Ajax. These governing Specifications included acceptance criteria and requirements that the Tooling had to meet before being accepted by SBD. Agreement.

16. In the event that the Tooling failed to pass this testing or otherwise failed to comply with the governing Specifications, SBD had the right to withhold acceptance. It was Ajax's duty, under the Agreement, to make all adjustments or modifications needed to bring the Tooling into compliance with the Specifications. Where the failures resulted from defects in Ajax's design or specifications, the cost of all such adjustments and modifications was to be borne by Ajax. Any uncured failure to comply with the testing requirements or other Specifications gave SBD the right to reject the Tooling and terminate the Agreement for breach.

17. The Agreement set out a series of remedies for Ajax's failure to provide Tooling in compliance with the acceptance criteria or other requirements set out in the Specifications. SBD's remedies in the event of such breaches extended to "all remedies available at law or in equity, including but not limited to" the following:

> Buyer may notify Seller to remove the Tooling from Buyer's facility, at Seller's sole cost and expense and shall refund the full Price of the Tooling to Buyer.

Agreement, Art. 8.5.

**IV.     Ajax breaches the Agreement by failing to deliver equipment meeting the governing Specifications.**

18.     In accordance with the Agreement, SBD paid Ajax 30 percent of the total purchase price upon acceptance of the Quotation and receipt of the Purchase Order for the four press machines and related accessories to be delivered under the Agreement (i.e., Milestone 1). *Id.* Art. 3.2. SBD also made additional payments, totaling approximately 50 percent of the total purchase price, based on certain interim milestones (Milestone 2).

19.     By June of 2021, Ajax had begun the process of delivering and installing the Tooling to SBD's Fort Worth facility, and SBD's payments to Ajax under the Agreement totaled $3,785,082, or approximately 80 percent of the total contract price.

20.     Since the Agreement's execution, Ajax's performance has been marked by numerous delays, design failures, and failures to meet the Agreement's Specifications. Ajax failed to deliver the mechanical press machines and related accessories within the time provided under the Agreement.  Moreover, even after the completion of initial deliveries, the Tooling provided by Ajax repeatedly failed to satisfy acceptance testing following installation at the Fort Worth facility, and the Tooling has never been capable of complying with the Specifications under the Agreement.

21.     Ajax's numerous design issues, mechanical failures, and testing failures have resulted in its inability to meet the Specifications and deliver Tooling in compliance with the Agreement. These persistent design problems and reliability issues have affected both the machine presses themselves and the accompanying straighten and cut machines included as accessories.

22.     The straighten and cut machines included as part of the Tooling exhibited a design flaw that prevented the shears from performing reliably and in accordance with the Specifications. This equipment also exhibited excessive oil leaks, improper and unsafe guarding, and bolt breaks. All of the straighten and cut machines provided to SBD under the Agreement share these same

design flaws. As a result of these failures, the equipment could only run for a few hours and then had to be shut down for days. SBD provided notice of these failures to Ajax in May of 2021, but these issues have never been adequately remediated.

23. The mechanical press machines themselves also exhibited major reliability and performance failures. These included clutch problems, brake failures, and a persistent inability to conform to the Specifications and meet testing requirements.

24. SBD informed Ajax of these failures, formally and informally, on numerous occasions. On August 25, 2021, SBD provided formal notice to Ajax that its failure to meet contractual obligations and timelines for full operational capability of the Tooling placed Ajax in breach of contract. SBD demanded that Ajax complete its work, and have its Tooling certified as fully operational in compliance with the Agreement and Scope of Work, by September 1, 2021.

25. In response, Ajax assured SBD that it would remediate its failures and bring the Tooling into conformance with the Agreement. On multiple occasions, Ajax acknowledged that the Tooling failed to comply with the Specifications and failed to meet acceptance testing criteria under the Agreement. In an effort to remediate these failures, Ajax attempted to redesign, repair, and rebuild the Tooling.

26. Ajax has expressly recognized that a "full disposition and reassembly" of the mechanical press machines, as well as "a redesign and modification" of the straighten and cut machines, must be completed.

27. As part of its remediation effort, Ajax retook possession of one of the four mechanical presses delivered to SBD's Fort Worth facility. Ajax planned to tear down, redesign, and repair this equipment, on the understanding that all necessary remediation could then be applied to the non-working presses that remained in SBD's possession. In addition, Ajax also

retook possession of two of the straighten and cut machines included as accessories under the Agreement after their initial delivery to SBD's Fort Worth facility. As part of its remediation efforts, Ajax requested, and SBD provided, two of SBD's coil rollers for use in Ajax's remediation efforts. These coil rollers belong to SBD. They were not purchased from and were not included among the Equipment purchased from Ajax.

28. Ajax made repeated attempts to redesign, reassemble, and otherwise remediate the Tooling to bring it into compliance with the Specifications and to cure Ajax's failures under the Agreement. None of these efforts were successful.

29. By June of 2021, SBD had paid Ajax a total of $3,785,082, or approximately 80 percent of the total contract price, pursuant to the agreement. Despite receiving millions of dollars under the Agreement, Ajax has never been able to provide Tooling that complies with the contract and meets the governing Specifications.

### V. Despite its continuing breaches and failure to deliver conforming equipment, Ajax demands still more money and threatens to stop performing.

30. Ajax's continuing (and admitted) failures to provide SBD with operational, functional equipment in compliance with the parties' Agreement amount to material breaches by Ajax. Yet, in response to these breaches, Ajax has refused to continue its efforts to cure its failures unless SBD pays Ajax even more money, over and above the nearly $3.8 million already provided to date.

31. On December 22, 2022, Ajax's President threatened to cease work and "put the project on hold unless we receive payment of $500k." Ajax threatened this work stoppage without any good-faith basis or colorable claim of a contractual right to receive more money. Ajax then proceeded to cease all work on the Tooling without any contractual right to do so.

32. Faced with Ajax's persistent, continuing breaches of the Agreement, SBD

concluded that Ajax was unwilling and unable to remediate the Tooling and provide conforming equipment to SBD.

33. On February 8, 2023, SBD formally invoked its right, under Article 8.5 of the Agreement, to a full refund of all amounts paid to Ajax under the Agreement, as well as immediate return and removal of the remaining Tooling located at SBD's Fort Worth facility, at Ajax's sole cost and expense. Agreement, Art. 8.5. Ajax, however, has refused to refund the nearly $3.8 million it has received under the Agreement and has failed to retrieve or accept return of the Tooling at its sole expense.

34. As a result of Ajax's continuing, aggravated refusal to perform under the Agreement, SBD has suffered significant additional harm as well. Without operational Tooling, SBD was left unable to meet production schedules and commitments, or complete and ship sufficient wrenches, ratchets, and other products to fulfill its obligations to retailers and other customers. These retailers canceled their orders for SBD's hand-tools, and SBD was left without a viable market for the tools it had planned to manufacture and sell from its Fort Worth facility.

35. Eventually, in March 2023, SBD announced the closure of the Fort Worth manufacturing facility.

**VI.     In addition to breaching its contractual obligations, Ajax also engaged in conversion of SBD's coil rollers.**

36. As noted above, in an effort to address its persistent inability to provide functional, operational mechanical press machines and related accessories, Ajax attempted to redesign, rework, and reassemble the Tooling after its initial delivery to SBD's Fort Worth facility. In connection with that effort, Ajax retook possession of one of the mechanical press machines and two of the straighten and cut machines to be reworked and repaired at Ajax's own facility.

37. As part of that process, Ajax requested, and SBD agreed to provide, two of SBD's

coil rollers for use as part of the remediation effort. These coil rollers belong to SBD. They were not purchased from and were not included among the Equipment purchased form Ajax.

38. Nonetheless, following SBD's termination of the parties' Agreement, Ajax has refused to return these coil rollers to SBD. In fact, Ajax has claimed that it should be permitted to retain these coil rollers and "to dispose of [them] in any manner of Ajax's choosing." These coil rollers, however, indisputably belong to SBD and are not subject to any legitimate claim or interest of Ajax.

## COUNT ONE
### Breach of Contract

39. Plaintiff repeats and re-alleges paragraphs 1 through 38 as though fully set forth here.

40. The parties entered into a valid and enforceable contract.

41. As set forth above, defendant has breached, among other provisions, Articles 6.1, 6.2, 6.3, 8.1, and 8.3 of the Agreement.

42. Plaintiff has fully performed its obligations under the Agreement or any failure to perform is excused.

43. As a result of defendant's breaches of the Agreement, plaintiff has suffered damages.

44. Under Section 8.5 of the Agreement, plaintiff's damages include a "refund [of] the full price of the Tooling" paid by SBD to date, which totals total $3,785,082.

45. In addition, plaintiff is also entitled to have defendant "remove the Tooling from [its] facility, at [Ajax's] sole cost and expense," and/or to recover the cost of removal if defendant fails to comply with this obligation.

46. These remedies are in addition to any and all other applicable remedies "available

at law or in equity."

## COUNT TWO
### Violation of the Connecticut Unfair Trade Practices Act

47. Plaintiff repeats and re-alleges paragraphs 1 through 46 as though fully set forth here.

48. As described above, defendant's unfair and deceptive trade practices are a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 41-110 et seq.

49. Defendant's conduct offends public policy, is immoral, unethical, oppressive and/or unscrupulous and caused substantial injuries to plaintiff.

50. At all times, defendant acted with reckless indifference to the rights of plaintiff or engaged in an intentional and wanton violation of those rights without justification.

51. Plaintiff has suffered an ascertainable loss as a result of defendant's unfair and/or deceptive method or practice.

52. Plaintiff further seeks an award for its costs, attorney's fees and punitive damages.

## COUNT THREE
### Conversion

53. Plaintiff repeats and re-alleges paragraphs 1 through 52 as though fully set forth here.

54. Plaintiff, being the owner and in possession of its two coil rollers, delivered the same to the defendant for use in connection with the defendant's efforts to redesign and remediate the Tooling that defendant had delivered subject to the Agreement.

55. Although the plaintiff is now entitled to and has demanded return of the coil rollers, the defendant has refused to return them to the plaintiff and has thereby converted the coil rollers to defendant's own use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment from the Court:

(i) for damages in an amount to be determined;

(ii) for an order of specific performance requiring defendant to remove the Tooling previously delivered under the Agreement from SBD's facility at defendant's sole expense;

(iii) for the award of punitive damages;

(iv) for the award of pre and post judgment interest on SBD's damages;

(v) for the award of costs and expenses, including reasonable attorneys' fees;

(vi) for the entry of an injunction requiring the immediate return of SBD's coil rollers by defendant;

(vii) for such other and further relief as this Court may deem just and proper.

Dated:  August 7, 2023                                         Respectfully submitted,

**PLAINTIFF, STANLEY BLACK & DECKER INC.**

By: /s/ John W. Cerreta
    John W. Cerreta (ct28919)
    Day Pitney LLP
    242 Trumbull Street
    Hartford, Connecticut 06103
    Telephone:  (860) 275-0665
    Facsimile:  (860) 881-2517
    jcerreta@daypitney.com